# In the United States Court of Federal Claims

Nos. 22-388
22-453
Filed: February 10, 2023*
FOR PUBLICATION

**ABACUS TECHNOLOGY CORPORATION,**

***Plaintiff,***

**and**

**VALDEZ INTERNATIONAL CORPORATION,**

***Consolidated Plaintiff,***

**v.**

**UNITED STATES,**

***Defendant.***

*Alexander B. Ginsberg*, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, DC, for the plaintiff, with *Michael J. Anstett*, of counsel.

*Robert S. Gardner*, The Gardner Law Office, Colorado Springs, CO, for the consolidated plaintiff, with *Laura A. Gardner*, of counsel.

*Kelly Geddes*, *Vijaya S. Surampudi*, and *Richard Schroeder*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant, with *Isabelle P. Cutting*, Contract and Fiscal Law Section, U.S. Air Force, of counsel.

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on January 25, 2023, and directed the parties to propose redactions of confidential or proprietary information. (ECF 39.) The parties proposed redactions to the opinion on February 7, 2023. (ECF 43.) The Court accepted some of the parties' proposed redactions and rejected others and gave the parties two days to respond to the Court's proposed redactions. (ECF 44.) The parties did not respond. Accordingly, the Court releases publicly the opinion with the accepted redactions. Redactions are denoted with three asterisks in square brackets, [***].

## MEMORANDUM OPINION

***HERTLING*, Judge**

In this pre-award bid protest, the plaintiffs Abacus Technology Corporation ("Abacus") and Valdez International Corporation ("Valdez") challenge their elimination from the Air Force's Integrated Air Force Network Operations and Services II ("IAFNOS-2") procurement. The plaintiffs move for judgment on the administrative record and request injunctive relief on the grounds that the Air Force (1) arbitrarily and capriciously failed to evaluate their proposals substantively and (2) conducted improper communications with some other offerors. In addition to these arguments that both plaintiffs present, Abacus also challenges aspects of the Air Force's price evaluation of other proposals, and Valdez claims both that its proprietary information was unlawfully disclosed and that it is entitled to a more thorough pre-award debriefing. The defendant the United States, acting through the Air Force, cross-moves for judgment on the administrative record and disputes these claims.

As a preliminary matter, the plaintiffs have failed to establish standing to pursue some of their claims. Valdez has failed to allege facts establishing that it had a substantial chance of award of the contract absent the allegedly unlawful communications and the allegedly defective pre-award debriefing. Valdez thus lacks standing to pursue those claims. Abacus has not alleged facts demonstrating a substantial chance of award absent any of the errors it alleges; accordingly, it lacks standing to pursue all its claims.

Additionally, the Air Force evaluated the proposals according to the terms of the IAFNOS-2 solicitation, and the plaintiffs were not prejudiced by the supposedly unlawful communications. Furthermore, the Air Force's price evaluation was rational, there was no improper disclosure of Valdez's proprietary information, and the pre-award debriefing to Valdez was complete.

Accordingly, the plaintiffs' motions for judgment on the administrative record are denied, and the defendant's motion for judgment on the administrative record is granted.

## I. FACTUAL BACKGROUND

### A. The Release of Valdez's Information

Valdez is the incumbent contractor for the first Integrated Air Force Network Operations and Services contract ("IAFNOS-1"). Before the Air Force published any solicitation for IAFNOS-2, it published a draft performance of work statement ("PWS") in July 2019. (AR 1.)[1] Included in the draft PWS was a sample spreadsheet to be completed by all prospective offerors to an eventual solicitation. (AR 68-69.) The spreadsheet was apparently taken from Valdez's successful proposal for the IAFNOS-1 solicitation. Although the cells in the draft PWS

---

[1] Citations to the administrative record (Case No. 22-255, ECF 25, *supplemented by* ECF 33, 40, and 68) are cited as "AR" with the pagination reflected in that record as filed.

spreadsheet were empty aside from one example,[2] offerors could still access a tab of the spreadsheet listing 33 labor categories that Valdez had created for its successful prior proposal. (AR 68-69, 19990-91.) The labor categories included job titles such as "Program Manager," "Project Manager," "IT Subject Matter Expert," "Network Architect," "Senior Network Engineer," and the like.

Valdez contends that those labor categories were a part of a spreadsheet that had been marked "proprietary" and included in Valdez's successful proposal for the IAFNOS-1 contract. Valdez also asserts that the labor categories were not publicly available and reflected Valdez's approach on how to staff the contract most appropriately. (AR 18640-41.) The defendant does not controvert those assertions. Valdez believes that the Air Force's disclosure of the labor categories was inadvertent. (*Id.*)

The same day the Air Force published the draft PWS, a senior vice president of Valdez became aware of the disclosure of the labor categories. She promptly contacted the contracting officer to object to the unauthorized release of Valdez's proprietary information. (*Id.*) The contracting officer removed the labor categories from the posting but took no further action, despite Valdez's requests to the Air Force to determine which competitors may have accessed the information. (*Id.*) Potential offerors had access to the labor categories for one day. (*Id.*)

**B. The Solicitation**

On September 22, 2021, the Air Force issued a solicitation for the IAFNOS-2 contract, which is intended to "help enable Air Force (AF) war-fighter mission execution by providing network operations support services," to operate and maintain the availability of the Air Force Information Network. (AR 326.)[3] Under the solicitation, the Air Force is seeking required network-operations support services in six locations: Joint Base Langley-Eustis, Virginia; Peterson Air Force Base, Colorado; Scott Air Force Base, Illinois; Wright-Patterson Air Force Base, Ohio; Joint Base Pearl Harbor-Hickam, Hawaii; and Ramstein Air Base, Germany. (AR 692.) The solicitation contemplates an indefinite-delivery, indefinite-quantity ("IDIQ") contract with seven ordering periods totaling six years and 10 months of service and an option to extend the contract for six additional months. (AR 364-70, 785.) The minimum guaranteed price for the contract is $7,000,000, and the maximum value for the contract is $329 million. (AR 364.)

The solicitation was issued as "a competitive best value 100% small business set-aside source selection using trade-off." (AR 785.) The solicitation contemplates a single contract award to a responsible, eligible small business "whose proposal conforms to the solicitation requirements (to include all stated terms, conditions, representations, certifications, and all other information required by Section L of this solicitation) and is judged, based on the evaluation

---

[2] Valdez does not assert that the one example was taken from its proposal.

[3] The solicitation was amended five times. (*See* AR 17711.) Those amendments are not germane to this protest.

factors and subfactors, to represent the best value to the Government." (*Id.*) "Failure to meet a requirement may result in an offer being determined ineligible for award." (*Id.*)

The solicitation explained the elements relevant to the evaluation of a proposal:

> Past performance, technical acceptability, and price will be evaluated. All evaluation factors other than cost or price, when combined, are significantly more important than cost or price. The Government may elect to trade past performance for price on technically acceptable proposals, if warranted. By submission of its offer, the Offeror accedes to all solicitation requirements, including terms and conditions, representations and certifications, and technical requirements, in addition to those identified as evaluation factors or subfactors. Failure to meet a requirement may result in an offer being determined ineligible for award.

(*Id.*)

The solicitation cautioned offerors that evaluation of the offers would require the Air Force to exercise discretion and subjective professional judgment: "While the Government will strive for maximum objectivity, the source selection process, by its nature, is subjective; and therefore, professional judgement [*sic*] is implicit throughout the entire process." (*Id.*)

The solicitation provided a five-step evaluation process the Air Force would follow. (*Id.*) Under Step 1, "[a]ll proposals received will be ranked from lowest to highest total evaluated price (TEP)." (*Id.*)

Under Step 2, a "technical evaluation and price evaluation will be conducted for the **eight** lowest priced proposals." (AR 785 (bold in original).) For the technical evaluation, the Air Force "shall evaluate the technical proposals on a pass/fail basis, assigning ratings of Acceptable or Unacceptable." (AR 788.) A proposal would receive an "Acceptable" rating if it "clearly meets the minimum[ ]requirements of the solicitation." (*Id.*) A proposal would receive an "Unacceptable" rating if it "does not clearly meet the minimum requirements of the solicitation." (*Id.*) The solicitation explained that prices would be evaluated for reasonableness, unbalanced pricing, and completeness. (AR 790.) Additionally, professional compensation plans would be evaluated for realism to ensure that the plan "reflects a sound management approach and understanding of the contract requirements." (*Id.*) The solicitation provided that during Step 2, "[a]fter the initial round of technical evaluation, if any of the eight lowest priced proposals are technically unacceptable, the Government *may* evaluate additional lowest priced proposals." (AR 785 (emphasis added).)

Under Step 3, the Air Force would "[a]ssess past performance confidence for the eight lowest priced proposals. If discussions are to be conducted, they will be [in accordance with Department of Defense] Source Selection Procedures paragraphs 3.4-3.7." (*Id.*)

The solicitation explained that under Step 4, "[i]f a competitive range is required, the Government will establish a competitive range consisting of the most highly rated offers." (*Id.*) "If a competitive range is established and discussions are to be conducted, they will be [in accordance with Department of Defense] Source Selection Procedures paragraphs 3.4 – 3.6." (*Id.*)

Finally, under Step 5, the Air Force would make its best-value decision in accordance with Department of Defense Source Selection Procedures paragraphs 3.8 and 3.9. (*Id.*)

**C. Step 1 of the Evaluation**

When the proposal deadline passed on October 28, 2021, the Air Force had received 22 proposals. (AR 18031.)

Pursuant to Step 1, the Air Force ranked the proposals from lowest to highest TEP and highlighted the eight proposals with the lowest TEP for further evaluation:

| P# | CONTRACTOR | TOTAL EVALUATED PRICE |
|---|---|---|
| 10 | Computer World Svcs (CWS) ("Offeror 3") | [***] |
| 17 | Offeror 7 | [***] |
| 11 | Offeror 4 | [***] |
| 14 | Offeror 5 | [***] |
| 1 | Offeror 1 | [***] |
| 20 | Offeror 8 | [***] |
| 16 | Offeror 6 | [***] |
| 7 | Allicent ("Offeror 2") | [***] |
| 3 | Offeror 9 | [***] |
| 22 | Valdez | [***] |
| 8 | Offeror 11 | [***] |
| 6 | Offeror 12 | [***] |
| 21 | Offeror 13 | [***] |
| 9 | Offeror 14 | [***] |
| 5 | Offeror 15 | [***] |
| 2 | Abacus | [***] |
| 18 | Offeror 17 | [***] |
| 4 | Offeror 18 | [***] |
| 15 | Offeror 19 | [***] |
| 19 | Offeror 20 | [***] |
| 12 | Offeror 21 | [***] |
| 13 | Offeror 22 | [***] |

(AR 19836.)[4]

Valdez proposed the 10th lowest TEP; Abacus proposed the 16th lowest TEP. (*Id.*)

**D. Step 2 of the Evaluation**

From November 1, 2021, until January 3, 2022, the Air Force proceeded to conduct technical and price evaluations of the eight proposals with the lowest TEP. (AR 18024.)

The technical-evaluation team rated all eight proposals as "Unacceptable." (AR 17705.) Specifically, Offerors 1, 4, 6, and 7 exceeded shift-capacity limits at one of the bases. (AR 17723, 17823, 17903, 17952.) Offerors 2, 3, 4, 6, 7, and 8 failed to include an adequate number of personnel with specific certifications. (AR 17758, 17786-87, 17824-25, 17903-04, 17952-53, 17989-90.) Offerors 2, 4, and 6 did not provide an adequately precise labor matrix regarding the number of digits required for each job code. (AR 17757-59, 17823-25, 17903.) Offerors 3, 4, 6, 7, and 8 failed to provide adequate staffing for some of the PWS tasks. (AR 17786-87, 17823, 17903, 17951, 17988.) Offeror 5 failed to provide sufficient details in its labor matrix to permit the Air Force to adequately evaluate Offeror 5's appendices. (AR 17860.) Under Offeror 6's proposal, 80 percent of its personnel would not have attained formal education beyond high school. (AR 17905.) Offeror 8 did not propose any personnel with a Top-Secret clearance at one of the bases as the solicitation required. (AR 17990.)

The Air Force also evaluated the proposed prices of the eight lowest-priced offers for reasonableness, unbalanced pricing, and completeness. For each of the eight offerors, the Air Force concluded that the likelihood of proposal revisions made it impossible to conduct complete price evaluations. For each of the eight offerors, the Air Force concluded as to price reasonableness that because the offer was not technically acceptable, "there is a high likelihood that proposed pricing will change with technical revisions, and therefore could not be determined reasonable at this time." (AR 17753, 17782, 17819, 17856, 17899, 17948, 17984, 18023.) The Air Force also determined that "an Unbalanced Pricing Evaluation could not be completed at this time," but that the Air Force would check all pricing for balance if the proposals were revised. (AR 17754, 17782, 17819, 17856, 17899, 17948, 17984, 18023.) The offerors' prices were deemed mathematically accurate and complete, but the Air Force noted its intent to check all pricing for completeness if the proposals were revised. (AR 17754, 17782, 17819, 17857, 17899, 17948, 17984, 18023.)

The Air Force evaluated the offerors' professional compensation plans by comparing the proposed salaries to data from the Bureau of Labor Statistics ("BLS") and to data from

[4] This table has been reformatted to conform with this memorandum opinion and enable more efficient redaction of proprietary data.

Salary.com.[5] The Air Force highlighted proposed labor rates falling below the 10th percentile or above the 90th percentile of labor rates for comparable job positions, according to the BLS data. At oral argument, the defendant asserted that 21 of 331 proposed labor rates were found to be below the 10th percentile of BLS data, and the plaintiffs accepted that assertion.[6] (Recording of oral argument on file with the court at 01:19:47-01:20:16, 01:58:22-01:01:58:50.) One offeror did not provide enough detail in its labor matrix to permit evaluation of its proposed labor rates. (AR 17860.)

For each of the eight offerors, the Air Force reached the same conclusion: "The Government compared the proposed labor rates with the provided Bureau of Labor Statistics system data as well as additional supporting documentation and determined the proposed rates are realistic." (AR 17754, 17782, 17820, 17857, 17900, 17949, 17985, 18024.)

All eight proposals with the lowest TEP were technically unacceptable. Nonetheless, the Air Force decided not to exercise the option it had left itself in the solicitation to evaluate any additional proposals because the technical evaluation team determined that the flaws in the proposals were "correctable" through discussions. (AR 17707, 18025.)

**E. Communications with Several Offerors**

The Air Force communicated with some of the offerors prior to the establishment of the competitive range.

An Air Force contract specialist emailed an employee of Offeror 3 three times: on December 6, 2021; December 20, 2021; and January 14, 2022. (AR 20085-86, 20121-22, 20158-59.) The contract specialist framed her questions as requests for "clarification," but she instructed the employee to submit revised documents reflecting Offeror 3's past performance.

---

[5] The defendant explained at oral argument that the BLS data was national, not regional. The plaintiffs did not controvert that explanation. The administrative record supports an inference that the Air Force relied on national data at Step 2 of this procurement. (*See, e.g.*, AR 19580 (noting that the percentiles for salaries of Applications Programmers were established based on the "United States Average").) The defendant represented that proposed pricing would be re-evaluated against regional data at a later stage of the procurement.

[6] By the Court's count, there were 53 out of 542 proposed labor rates falling below the 10th percentile of BLS data. (AR 18756-59 (highlighting 11 of 110 labor rates as below the 10th percentile); AR 18962-66 (highlighting 14 of 69 labor rates); AR 19075-78 (highlighting 20 of 127 labor rates); AR 19331-32 (highlighting one of 85 labor rates); AR 19569-73 (highlighting seven of 57 labor rates).) Two offerors proposed no labor rates below the 10th percentile of BLS data. (AR 18848-51 (proposing zero out of 38 labor rates); AR 19454-63 (proposing zero out of 56 labor rates).) Some of the labor rates submitted, however, may be duplicates; the Court accepts the defendant's undisputed estimate.

(AR 20085-86, 20121-22, 20158-59.) In response to each request, the employee from Offeror 3 submitted revised past-performance documents. (AR 20094-95, 20155, 20192-96.)

The Air Force contract specialist also emailed an employee of Offeror 4 on December 6, 2021, and January 14, 2022, requesting revised past-performance documents. (AR 20208-10, 20265.) The employee of Offeror 4 responded with revised past-performance documents. (AR 20222-23, 20246.)

Additionally, the Air Force contract specialist emailed an employee of Offeror 7 requesting revisions to past-performance documents on December 6, 2021; December 14, 2021; and January 14, 2022. (AR 20296, 20359-60, 20416-17.) In response to each request, the employee of Offeror 7 submitted revised, redlined past-performance documents. (AR 20311-13, 20359-415, 20416-20.)

The Air Force contract specialist emailed Offeror 8 requesting revised past-performance documents on December 13, 2021, and December 16, 2021. (AR 20423, 20520-21.) The employee of Offeror 8 submitted revised, redlined past-performance documents. (AR 20506, 20604.)

**F. Steps 3 and 4**

Under Step 3, the Air Force evaluated the past performances of the eight offerors that had submitted the lowest TEP. Five offerors received a rating of "Substantial" confidence; two offerors received a rating of "Satisfactory" confidence; and one offeror received a rating of "Neutral" confidence. (AR 18034.)

Under Step 4, on February 23, 2022, the Air Force established a competitive range of five offerors, excluding those that received a less-than "Substantial" confidence rating regarding their past performance. (AR 18036, 18040.) On October 21, 2022, the Air Force placed in the competitive range the three other offerors of the initial eight with the lowest TEP in response to related bid protests. (AR 21099.)

The defendant has agreed to stay award of the IAFNOS-2 contract pending resolution of these protests and therefore has not proceeded to Step 5. (*See* Case No. 22-255, ECF 17.)

**G. Exclusion of the Plaintiffs from the Competition**

On February 23, 2022, an Air Force contracting officer notified the plaintiffs of their exclusion from the competition. (AR 18041, 18072.)

The contracting officer indicated: "The evaluation of your offer submitted in response to subject solicitation has been completed. Based on the findings of this evaluation and in accordance with Federal Acquisition Regulation (FAR) Part 15.306(c)(3), your offer has been determined to be outside of the competitive range and will not be considered further." (AR 18041, 18072.)

The contracting officer explained that both plaintiffs' proposals were excluded from the competitive range because they were not among the eight lowest-priced proposals. (AR 18041, 18072.) Although the Air Force would not consider a proposal revision, rejected offerors were invited to request a debriefing in accordance with FAR 15.505 (pre-award debriefing) or 15.506 (post-award debriefing). (AR 18041, 18072.)

### H. Valdez's Request for a Debriefing

Valdez requested a pre-award debriefing via e-mail on February 24, 2022. (AR 18243.) Valdez did not pose any specific questions in its request for a pre-award debriefing. (*Id.*)

An Air Force contracting officer responded to Valdez by letter on February 28, 2022. (AR 18240.) The debriefing letter explains that the "Government's evaluation revealed your proposal was not among the eight lowest priced proposals. Therefore, no further evaluation was conducted on your proposal." (*Id.*) The Air Force considered the letter "as satisfying the requirement to conduct preaward debriefings in accordance with FAR 15.505." (*Id.*) Valdez's "debriefing of IAFNOS-2 is considered concluded upon the receipt of this letter." (*Id.*) The letter noted that the Air Force could not and would not "disclose the content of other [offerors'] proposals, the identity/evaluation results of other Offerors, any trade secrets, privileged or confidential information or any other source selection sensitive information." (*Id.*)

Following its receipt of the Air Force's reply, Valdez did not pose any further questions to the contracting officer as part of the pre-award debriefing.[7] By contrast, other offerors in receipt of nearly identical pre-award debriefing letters posed additional questions to the contracting officer. (*E.g.*, AR 18234-36.)

## II. PROCEDURAL HISTORY

The IAFNOS-2 procurement initially spawned four separate bid protests. First, on March 7, 2022, one offeror, Allicent Technology, LLC ("Allicent"), filed its complaint in this court. (Case No. 22-255, ECF 1.)

Second, on March 8, 2022, another offeror, Computer World Services Corporation ("CWS"), filed a protest with the Government Accountability Office ("GAO"). (Case No. 22-365, ECF 1 at ¶ 28.) The Air Force requested dismissal of that protest because of Allicent's suit pending here. (*Id.* at ¶ 29.) CWS withdrew its protest with the GAO and filed a complaint in this court on March 31, 2022. (*Id.*)

Third, Abacus filed a protest of the IAFNOS-2 procurement with the GAO on March 10, 2022. (Case No. 22-388, ECF 1 at ¶ 40.) In light of Allicent's challenge to the procurement

---

[7] The administrative record reflects that Valdez requested a post-award debriefing, which the contracting officer refused pursuant to FAR 15.505(a)(3). (AR 18242.) Valdez does not request a post-award debriefing in this bid protest. (Recording of oral argument on file with the court at 02:36:04-02:37:00.)

before this court, Abacus voluntarily withdrew its protest before the GAO and filed its complaint in this court on April 4, 2022. (*Id.* at ¶¶ 41-42.)

Finally, Valdez also filed a protest with the GAO on March 10, 2022. (Case No. 22-453, ECF 1 at ¶ 15.) That protest was dismissed for lack of jurisdiction due to the pendency of multiple protests before this court. (*Id.* at ¶ 17.) On April 20, 2022, Valdez filed its complaint with this court. (*Id.*)

The defendant filed the administrative record four times in each case. (Case No. 22-255, ECF 23; Case No. 22-365, ECF 17; Case No. 22-388, ECF 22; Case No. 22-453, ECF 15.)

On May 24, 2022, the parties filed a joint motion to consolidate all four bid protests. (Case No. 22-255, ECF 28.) That motion was granted, and the cases were consolidated under the then-lead case, *Allicent Technology, LLC v. United States*, Case No. 22-255. (Case No. 22-255, ECF 29.) The defendant filed two supplements to the administrative record. (Case No. 22-255, ECF 33, 40.)

On August 11, 2022, the four plaintiffs filed their motions for judgment on the administrative record ("MJARs"). (Case No. 22-255, ECF 42, 44, 47, 48.) The defendant requested and received two enlargements of time to respond to the MJARs. (Case No. 22-255, ECF 51, 52, 53, 54.)

On October 21, 2022, the defendant filed a notice that the Air Force intended to take corrective action regarding the claims of two of the plaintiffs, Allicent and CWS. (Case No. 22-255, ECF 55.) Because Allicent's and CWS's proposals had been among the eight lowest-TEP offers, the Air Force had conducted technical and price evaluations of both proposals but had eliminated them from the competitive range. Their claims were therefore distinct from the claims made by Abacus and Valdez, whose proposals were not among the eight proposals with the lowest TEP. (*Id.*) The defendant requested that the briefing schedule be vacated with respect to CWS and Allicent and requested a brief extension of its time to respond to Abacus's and Valdez's MJARs. (*Id.*)

On October 25, 2022, following a status conference, the cases brought by Allicent and CWS were stayed, and the briefing schedule in the cases brought by Abacus and Valdez was amended. (Case No. 22-255, ECF 59.)

On October 27, 2022, the defendant filed responses to Abacus's and Valdez's MJARs and a cross-motion for judgment on the administrative record. (Case No. 22-255, ECF 63.) The defendant supplemented the administrative record with the Air Force's corrective action towards Allicent and CWS on November 17, 2022. (Case No. 22-255, ECF 71.)

The plaintiffs Abacus and Valdez filed replies on December 7, 2022. (Case No. 22-255, ECF 74, 75.) The defendant filed a reply on December 15, 2022. (Case No. 22-255, ECF 77.)

Plaintiffs Allicent and CWS filed motions to dismiss their cases voluntarily on December 19, 2022. (Case No. 22-255, ECF 78, 79.) Those motions were granted, and the cases brought by Allicent and CWS were dismissed. (ECF 80.) The remaining two bid protests were

reconsolidated under a new lead case, *Abacus Technology Corporation v. United States*, Case No. 22-388. (*Id*.) The pending motions related to the protests brought by Abacus and Valdez were transferred to the new docket. (*See* Case No. 22-388, ECF 29 (Abacus's MJAR), ECF 30 (Valdez's MJAR), ECF 31 (the defendant's MJAR).)

Oral argument on the two bid protests was held on January 19, 2023.

## III. JURISDICTION AND STANDING

The court has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

The plaintiffs have alleged violations of procurement law in connection with the Air Force's IAFNOS-2 procurement, but they must also establish that they are "interested parties." *Id*.

To be an interested party, a protestor must allege facts, which if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). A bid protestor bears the burden of establishing the elements of its standing to sue. *E.g.*, *Diaz v. United States*, 853 F.3d 1355, 1359 (Fed. Cir. 2017).

Both plaintiffs satisfy the first prong of the standing inquiry because they were actual bidders in the IAFNOS-2 procurement. The inquiry thus shifts to whether the plaintiffs have alleged facts sufficient to establish the requisite direct economic interest.

In a pre-award bid protest that does not challenge the solicitation, a protestor possesses the requisite direct economic interest if it alleges facts demonstrating it had a "substantial chance" of award but for the alleged errors in the procurement process. *E.g.*, *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348-49 (Fed. Cir. 2013).

### A. Valdez

Valdez asserts four claims. First, it argues that the terms of the solicitation and the FAR required the Air Force to evaluate Valdez's proposal after proposals with lower TEPs were found technically unacceptable. Second, Valdez claims that the Air Force conducted improper discussions. Third, Valdez argues that the Air Force's accidental release of Valdez's proprietary information violated the Procurement Integrity Act ("PIA"). Fourth, Valdez argues that it was entitled to answers to its questions during the pre-award debriefing.

First, Valdez possesses the requisite direct economic interest in its claim that the Air Force was required to evaluate its proposal. Valdez proposed the 10th lowest TEP but was eliminated from the competition because its TEP was not among the eight lowest proposed. Valdez just barely missed the cut-off; its TEP was just [***] percent higher than the eighth lowest TEP. (*See* AR 19836.) Valdez is the incumbent contractor on the IAFNOS-1

procurement. If the Air Force had decided to conduct technical evaluations on just two additional proposals, Valdez's proposal would have been evaluated and may have been included in the competitive range. Valdez thus has a "substantial chance" of award if it prevails in its argument that the solicitation required the Air Force to consider additional proposals.

Second, Valdez does not possess the requisite direct economic interest in its unlawful-communications claim. The supposedly unlawful communications occurred at Step 3 of the procurement; Valdez was eliminated at Step 1. While Valdez was eliminated due to its proposed price alone, the communications concerned issues of offerors' past performance. Additionally, unlike Step 2 of the procurement, Step 3 did not permit the evaluation of additional proposals if some offerors' past-performance information was found unsatisfactory. (AR 785.) Valdez's allegations of improper communications are entirely disconnected from Valdez's elimination from the competition. *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009) (requiring a connection between the alleged error and the bid protestor's failure to secure the contract to establish standing). Valdez has not alleged facts demonstrating that absent the allegedly unlawful communications, it stood a substantial chance of award. *See, e.g., Orion Tech.*, 704 F.3d at 348-49.

Valdez argues that it has standing because at the time of the allegedly unlawful communications, Valdez had not been formally eliminated from the procurement. Thus, Valdez argues that the Air Force was required to allow Valdez to remedy the price deficiencies in Valdez's proposal. *See* FAR 15.306(d)(3) (requiring a contracting officer to discuss "significant weaknesses" and "deficiencies" with offerors still under consideration for award).

Valdez's argument fails because offerors are not permitted to make material alterations to their proposed prices before the establishment of the competitive range. *See* FAR 15.306(b)(2). Additionally, Valdez misreads FAR 15.306(d)(3), which applies only to an "offeror still being considered for award." Although Valdez had not been formally eliminated at the time of the allegedly unlawful communications, Valdez's offer was not under consideration for award. Accordingly, Valdez lacks standing to pursue this claim.

Third, as the incumbent contractor, Valdez possesses a direct economic interest in the protection of its proprietary information. Valdez therefore has standing to pursue its claim that the Air Force violated the PIA.

Fourth, Valdez does not possess the requisite direct economic interest in a more detailed pre-award debriefing. When Valdez received the pre-award debriefing, it was no longer in line for contract award. The substance of the debriefing thus had no impact on Valdez's chance for award. It is impossible that Valdez stood a substantial chance of award absent the allegedly defective debriefing. Valdez lacks standing to pursue this claim.

**B. Abacus**

Abacus asserts three claims. Its first two claims are identical to Valdez's first two claims: Abacus argues that the solicitation required the Air Force to evaluate its proposal and that the Air

Force engaged in improper communications. Additionally, Abacus argues that the Air Force's evaluation of other offerors' professional compensation plans was arbitrary and capricious.

Notably, Abacus proposed the 16th lowest TEP, and its TEP was approximately [***] percent higher than the eighth lowest TEP. For Abacus's proposal merely to be evaluated under any of its three claims for relief, the Air Force would have needed to decide to double the number of technical evaluations it conducted at Step 2 of the procurement.

Abacus argues that it has standing to protest for two reasons. First, Abacus notes that the solicitation did not say "one-in, one-out." The Air Force could have included as many proposals as it wanted to in Step 2 of the IAFNOS-2 procurement in compliance with the solicitation. Abacus argues that the Air Force committed to evaluating no more than eight proposals under a misguided assumption that the solicitation did not afford it discretion to evaluate additional proposals. Second, establishing standing does not require certainty that the protestor would have received the award. Abacus argues that after other proposals were found to be technically unacceptable and the Air Force engaged in communications, there was a substantial chance that Abacus would have been included in the procurement.

Abacus is correct that the solicitation did not require the rejection of one offeror in favor of another to maintain a group of eight, *i.e.*, "one-in, one-out." Theoretically, the Air Force could have conducted technical evaluations on 10, 12, or even all 22 proposals. Step 2 in the solicitation reserved to the Air Force the discretion to evaluate additional proposals if any of the eight proposals with the lowest TEPs were found to be technically unacceptable. The mere possibility of evaluation, however, does not necessarily equate to a "substantial chance" of award. *Cf. Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (finding a lack of prejudice on the merits when the bid protestor's argument rested on "conjecture" and "mere numerical possibility, not evidence").

Precedents from the Federal Circuit are instructive on the question of Abacus's standing. In *Orion Technology*, for example, a protestor challenged its exclusion from the competitive range based on missing information. 704 F.3d at 1346. The Federal Circuit held that the bid protestor had standing to sue because the agency had discretion to continue to evaluate the protestor's proposal, and the protestor's "total cost/price that was provided in its original proposal was also within the later established competitive range." *Id.* at 1348-49. By contrast, in *Eskridge & Associates v. United States*, the Federal Circuit held that a protestor could not establish a substantial chance of award when it was out-ranked by three lower-priced, technically acceptable bids in a lowest-priced, technically acceptable procurement. 955 F.3d 1339, 1345 (Fed. Cir. 2020).

To establish standing to sue, Abacus thus must allege that its proposal was priced in the ballpark of those still under consideration. It cannot do so. Abacus points to no provision of the solicitation or the FAR that would require the evaluation of *eight* additional proposals because the eight with the lowest TEP were all found to be technically unacceptable. The Air Force's *discretion* to evaluate additional proposals does not equate to a *substantial chance* of inclusion in the competitive range. *See Bannum*, 404 F.3d at 1358; *Orion Tech.*, 704 F.3d at 1348-49. As was the case in *Eskridge*, many other offerors stood in line between Abacus and the offerors

whose proposals are still under consideration. *See* 955 F.3d at 1345. Unlike in *Orion Technology*, Abacus's TEP is much greater than those of the eight offerors under consideration. *See* 704 F.3d at 1348-49.

Even if the Air Force for some reason decided to broaden its consideration to 16 offerors, Abacus's proposal would be unlikely to present the best value to the Air Force because its proposed TEP was much higher than those of other offers. Abacus has failed to demonstrate that under the alleged facts, it stood a substantial chance of award; rather, Abacus's chances of prevailing were slim under the alleged facts.

Abacus does not explain why an expansion of the group of eight proposals evaluated, Abacus's inclusion among the offerors with whom the Air Force conducted communications, or a different evaluation of the professional compensation plans would give Abacus a substantial chance of award. Accordingly, Abacus has not established standing to protest, and its complaint must be dismissed.

### C. Conclusion

Valdez has standing to pursue its claims that it was wrongfully eliminated from the competition and that the Air Force violated the PIA. Valdez lacks standing, however, to pursue its claim of unlawful communications and its pre-award debriefing claim. Those claims are dismissed pursuant to RCFC 12(b)(1). Abacus lacks standing to pursue all three of its claims, and its complaint must be dismissed under RCFC 12(b)(1). Notwithstanding the dismissal of two of Valdez's four claims and all of Abacus's claims for lack of standing, the merits of these dismissed claims will be considered as an alternative basis for resolving the parties' protests.

## IV. STANDARD OF REVIEW

### A. Motion for Judgment on the Administrative Record

Review of a motion for judgment on the administrative record pursuant to RCFC 52.1 requires the court to make factual findings based on the administrative record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Genuine issues of material fact do not preclude judgment. *Id.* Rather, the court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record. *Id.* at 1355.

### B. Bid Protests

Bid protests require a two-step analysis. *See Bannum*, 404 F.3d at 1351. First, the court must determine whether the government's conduct is "arbitrary and capricious," or "not in accordance with law" under 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706; *Bannum*, 404 F.3d at 1351. "'[A] bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation

of regulation or procedure.'" *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Domenico Garufi*, 238 F.3d at 1332).

Second, if the government's conduct was "arbitrary and capricious" or "not in accordance with law," the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. A bid protestor can demonstrate prejudice on the merits if it "show[s] that there was a 'substantial chance' it would have received the contract award but for the errors" in the procurement process. *Id.* at 1353 (quoting *Info. Tech. Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

Agency decisions are "'entitled to a presumption of regularity.'" *Palantir USG, Inc. v. United States*, 904 F.3d 980, 995 (Fed. Cir. 2018) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001)). "'Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.'" *Id.* (quoting *Domenico Garufi*, 238 F.3d at 1338); *see also DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1315 (Fed. Cir. 2021) (holding that an explicit explanation is unnecessary when the agency's decisional path is reasonably discernible).

A court's review of the procurement decision made by the procuring agency in a bid protest is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A court will not disturb an agency's determination so long as there is a reasonable basis for it, even if the court might "have reached a different conclusion as to the proper administration and application of the procurement regulations" in the first instance. *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). A court must take care not to substitute its judgment for that of the agency, even if reasonable minds could reach different conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

## V. DISCUSSION

Abacus and Valdez challenge five aspects of the IAFNOS-2 procurement. First, both plaintiffs argue that under the terms of the solicitation, the Air Force should have considered additional proposals when the eight proposals with the lowest TEP were deemed technically unacceptable. Second, the plaintiffs argue that the Air Force's communications with some offerors regarding their past performance were improper. Third, Abacus challenges the Air Force's review of offerors' professional compensation plans as arbitrary and capricious. Fourth, Valdez argues that the contracting officer violated FAR 3.407 by failing to report properly a possible violation of the PIA. Finally, Valdez argues that it is entitled to a more comprehensive debriefing.

As previously discussed, Abacus lacks standing to pursue any of its claims, and Valdez lacks standing to pursue its claims that the Air Force's communications were unlawful and that the pre-award debriefing was defective. Nonetheless, those arguments are evaluated on the merits in the alternative.

### A. Steps 1 and 2 of the Procurement

The plaintiffs challenge the fact that the Air Force never substantively evaluated their proposals. The plaintiffs' proposals were excluded at Step 1 of the procurement because they were not among the eight proposals with the lowest TEP. At Step 2 of the procurement, the Air Force determined first that all eight proposals under consideration were technically unacceptable, and second that the reasonableness of the pricing of each offer could not be assessed because the proposals required revisions to become technically acceptable. The plaintiffs argue that upon those determinations the Air Force was required by the solicitation to consider additional proposals. (ECF 29 at 32-33; ECF 30-1 at 20-21.)[8]

The defendant argues that the Air Force's decision not to evaluate additional proposals is consistent with the solicitation, which explicitly preserved the Air Force's discretion to evaluate only the eight proposals with the lowest TEP. (ECF 31 at 13-24.) To the extent that the plaintiffs challenge the solicitation, the defendant argues, their challenge is waived under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).

The plaintiffs reply that they do not challenge the solicitation itself and that *Blue & Gold Fleet* is therefore inapposite. (ECF 35 at 8 n.1 ("[T]his protest plainly involves no challenge to the Solicitation terms."); ECF 36 at 14 ("Valdez has not taken issue with the Solicitation . . . ."))

The solicitation provides the steps the Air Force would take in the procurement:

> a. Step 1: All proposals received will be ranked from lowest to highest total evaluated price (TEP).
>
> b. Step 2: A technical evaluation and price evaluation will be conducted for the **eight** lowest priced proposals. After the initial round of technical evaluation, if any of the eight lowest priced proposals are technically unacceptable, the Government *may* evaluate additional lowest priced proposals.

(AR 785 (bold in original) (italicized emphasis added).)

The Air Force did exactly what it said it would do. First, it ranked all 22 proposals from lowest to highest TEP. (AR 19836.) Abacus had proposed the 16th lowest TEP, and Valdez had proposed the 10th lowest TEP. (*Id.*) Second, the Air Force evaluated only the eight proposals with the lowest TEP.

When those proposals were found to be technically unacceptable, the Air Force had the option, but not the obligation, under the solicitation to review additional proposals. Complete technical acceptability is required only for final award of the contract; all proposals need not be

---

[8] Unless otherwise noted, all electronic case filings referenced in the remainder of this opinion are now filed under the current lead case, Case No. 22-388.

technically acceptable at every stage of the procurement. (*See* AR 788 ("Only those technical proposals determined to be technically acceptable, either initially or *as a result of discussions*, will be considered for award.") (Emphasis added).) The solicitation provided that the Air Force "may" evaluate additional proposals, not that the Air Force was required to evaluate additional proposals. (AR 785.) The Air Force decided not to evaluate additional proposals because it determined that the errors in the proposals were correctable. (AR 17707, 18025.) The terms of the solicitation did not forbid the Air Force from continuing the procurement process with correctable proposals.

The Air Force did not further rationalize its decision not to evaluate additional proposals in any sort of memorandum in the administrative record. The Air Force is entitled to a "presumption of regularity," and thus need not provide an explanation for its decision not to consider additional proposals unless the decision is found to be arbitrary and capricious or inconsistent with the solicitation. *See Palantir*, 904 F.3d at 995. Additionally, unless the FAR provides otherwise, the Air Force is not required to document its rationale for every determination so long as the reasons for its determination are reasonably discernible from the record. *See DynCorp*, 10 F.4th at 1313. The Federal Circuit has held specifically that agencies have no requirement to document the rationale behind their price analyses. *Id.*

Potential reasons for the Air Force's decision not to evaluate additional proposals are discernible from the record. For example, some offerors provided labor codes to the three-digit level rather than the four-digit level; this minor ambiguity likely would be easy for these offerors to correct. (AR 17757-59, 17823-25, 17903.) Some offerors exceeded shift-capacity limits at one of the bases; this mistake also is readily correctable and likely to result in a lower, not a higher, price. (AR 17723, 17823, 17903, 17952.) The solicitation set a high bar for technical acceptability: To be technically acceptable, a proposal had to "*clearly* meet[ ]" the solicitation's minimum requirements. (AR 788 (emphasis added).) Any ambiguity in a proposal would thus render the entire proposal technically unacceptable. Additionally, the initial evaluation of the eight proposals took two months; evaluating more proposals would have required the expenditure of substantially more time and resources. (AR 18033.)

The plaintiffs argue that the Air Force's mechanical exclusion of all offerors but the eight with the lowest TEP was arbitrary and capricious when the Air Force was unable to evaluate fully whether the pricing of those offers was realistic and whether it was unbalanced. (*See, e.g.*, AR 17589 (the Air Force noting in a PowerPoint presentation that price reasonableness for an offeror was "not determined" and that the Air Force's overall assessment of the proposal was "TBD").) The plaintiffs assert that the Air Force abused its discretion when it did not exercise the discretion it reserved to itself. It is, however, "a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation." *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009). The solicitation explicitly contemplated the exclusion of all offerors from Step 2 except the eight with the lowest TEPs. Moreover, the plaintiffs fail to point to any provision in the solicitation or the FAR requiring the agency to conduct detailed price and technical analyses of all proposals received.

After the mechanical exclusion, the solicitation expressly reserved to the Air Force the decision of whether to return to Step 1 of the procurement when the eight proposals under

consideration were deemed technically unacceptable at Step 2. The solicitation did not provide any requirements as to how that discretion was to be exercised. The terms of the solicitation therefore expressly authorize the Air Force's approach.

Implicit in the Air Force's express reservation (and exercise) of discretion is the judgment that it was more efficient or effective to continue to pursue the offerors with the eight lowest TEPs than it was to consider additional offerors. The solicitation explained that although the Air Force would strive for objectivity, subjective professional judgment would be "implicit throughout the entire process." (AR 785.) Courts are ill-equipped to second-guess this type of reasonable, subjective determination by the agency, and this Court declines to substitute its judgment for that of the agency in making these subjective judgment calls. *See, e.g.*, *Bowman*, 419 U.S. at 285-86.

Additionally, Valdez argues that FAR 15.306(c) required the Air Force to evaluate *all* proposals received (including Valdez's proposal) before establishing the competitive range. FAR 15.306(c)(1) provides: "Agencies shall evaluate all proposals in accordance with 15.305(a), and, if discussions are to be conducted, establish the competitive range." FAR 15.305(a) provides that agencies must assess the relative qualities of proposals "solely on the factors and subfactors specified in the solicitation." FAR 15.305(a) also allows agencies flexibility in their evaluations of proposals: "Evaluations may be conducted using any rating method or combination of methods, including color or adjectival ratings, numerical weights, and *ordinal rankings*." (Emphasis added.)

The Air Force properly evaluated all proposals, including the plaintiffs' proposals, according to FAR 15.306(c) and FAR 15.305(a). The Air Force precisely followed the terms of the solicitation. *See* FAR 15.305(a). First, the Air Force established an "ordinal ranking" to identify the offerors who submitted the eight lowest proposed prices. *See id.* Second, the Air Force conducted technical and price evaluations on those eight offers. The plaintiffs' proposals were evaluated under FAR 15.306(c) because their offers were ranked according to their TEP. When the plaintiffs' proposals were not among the eight with the lowest TEP, the Air Force was entitled to eliminate them from consideration under the terms of the solicitation. The Air Force thus complied with FAR 15.306(c) and FAR 15.305(a).

Valdez argues that the elimination of all but eight proposals with the lowest price effectively converted the procurement process from a "best-value tradeoff" procurement to a "lowest price technically acceptable" procurement, in contravention of the terms of the solicitation. (*See* AR 785.) To support its argument, Valdez analogizes this case to *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 770 (2008). In that case, however, the source selection authority "accorded the price factor more weight than the solicitation permitted," and made several irrational tradeoffs. *Id.* at 767-70.

In this case, by contrast, the Air Force followed the terms of the solicitation exactly. All but eight offerors were eliminated based on price at Step 1 of the procurement. (*See* AR 785, 19836.) The best-value tradeoffs will not occur until Step 5, when the Air Force will make the "Best Value Decision." (AR 785.) This case is therefore distinct from *Femme Comp* because the Air Force has followed the steps outlined in the solicitation in the order the solicitation

indicates the Air Force would follow them. To the extent the plaintiffs are really complaining about the features of the multi-step process and their consistency with a best-value procurement, such a complaint is untimely pursuant to *Blue & Gold*. 492 F.3d at 1313; *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 767 (Fed. Cir. 2021) (noting that "the *Blue & Gold* waiver rule is predicated not only on the notion of avoiding delay that could benefit the delaying party, but also on the notion of preserving challenges and providing notice to interested parties").

The Air Force complied with the terms of the solicitation, and its decision not to exercise the discretion it reserved for itself in the solicitation was not arbitrary and capricious.[9]

**B. Communications**

The plaintiffs argue that the Air Force violated FAR 15.306 by holding improper communications with some offerors in December 2021 and January 2022.

The defendant responds that these communications were proper. In the alternative, the defendant argues that the plaintiffs have not demonstrated prejudice even if the communications violated FAR 15.306.

FAR 15.306 classifies procurement-related communications between an agency and offeror as clarifications, exchanges, negotiations, or discussions. "Clarifications" may occur only "when award without discussions is contemplated" either to "clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." FAR 15.306(a). "Exchanges" occur before the establishment of the competitive range and "shall not provide an opportunity for the offeror to revise its proposal." FAR 15.306(b). "Negotiations" and "discussions" occur only after the establishment of the competitive range. FAR 15.306(d). A government agency may not engage in conduct that "[f]avors one offeror over another." FAR 15.306(e)(1).

Even assuming the communications by the Air Force with some of the offerors violated FAR 15.306, the plaintiffs must still demonstrate that the communications prejudiced them in some way, and they are unable to do so.[10]

The Federal Circuit has rejected the proposition that "if the government makes any mistake in a procurement process . . . , no matter how slight or unharmful, then it must nullify the contest and begin anew." *Labatt*, 577 F.3d at 1380. "[N]on-prejudicial errors in a bid process do

---

[9] Even if the plaintiffs' arguments were accepted on the merits, Abacus would be unable to demonstrate prejudice because it did not stand a substantial chance of inclusion in the procurement or award.

[10] Because the plaintiffs are unable to show prejudice, the Court does not need to decide whether the communications between the Air Force and some offerors violated FAR 15.306.

not automatically invalidate a procurement." *Id.* In *Labatt*, the protestor failed to establish prejudice when there was "no connection" between the alleged error and the protestor's elimination from the procurement, and "the asserted error caused no harm" to the plaintiff. *Id.* at 1381.

Although the decision in *Labatt* addressed prejudice as it relates to standing rather than prejudice on the merits, the Federal Circuit has since explained that the question of whether the error was the actual cause of action adverse to the protestor is also relevant to the issue of whether the protestor suffered prejudice on the merits. *See Am. Relocation Connections, LLC v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019) (analyzing whether an error was in fact prejudicial on the merits by searching for a connection between the error and the protestor's elimination from the competition). To prove prejudice on the merits, a plaintiff must show a "greater-than-insignificant chance" that the "'correction of an error'" would "'yield a different result.'" *Id.* (quoting *Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 504 (Fed. Cir. 1995)).

The plaintiffs were excluded at Step 1 of the procurement because their proposals were not among the eight with the lowest TEP. The communications that occurred in December 2021 and January 2022 were related to the Air Force's evaluation of offerors' past performance under Step 3 of the procurement. Offerors were permitted to revise only the parts of their proposals that related to past performance; no TEP was raised, addressed, or revised as part of the challenged communications.

The communications caused no harm to the plaintiffs and therefore could not be prejudicial. *See Labatt*, 577 F.3d at 1381. If the Air Force re-established the competitive range based on the offerors' unrevised past-performance information, the plaintiffs still would be excluded from the competitive range because each had failed to offer one of the eight lowest TEPs. If the Air Force allowed the plaintiffs to revise the past-performance sections of their proposals, the plaintiffs' TEP would remain unchanged. Unlike Step 2 of the procurement, Step 3 of the procurement did not permit the Air Force to return to higher-priced proposals if none of the eight offerors had satisfactory past performance. (*See* AR 785.) Thus, "no connection" exists between the supposedly unlawful communications and the elimination of the plaintiffs from the competition. *See Labatt*, 577 F.3d at 1381. Any correction of the supposed errors would not result in the plaintiffs having a substantial chance of award. *See Am. Relocation Connections*, 789 F. App'x at 228.

The plaintiffs argue that they were prejudiced because the communications occurred in December of 2021 and January of 2022. The plaintiffs were not eliminated formally from the IAFNOS-2 procurement until February 23, 2022. (AR 18041, 18072.) They argue that the Air Force was therefore required to conduct discussions with them to address any deficiencies in their proposals, including price.

This argument fails for two reasons. First, offerors are prohibited from materially altering cost or price estimates through communications before the establishment of a competitive range. FAR 15.306(b)(2). Second, even if the communications between the Air Force and offerors constituted discussions, "the contracting officer is not required to discuss every area where the proposal could be improved," and the scope of discussions is at the

contracting officer's discretion. FAR 15.306(d)(3). The plaintiffs' opportunity to revise their prices before the establishment of the competitive range was therefore unlawful or, alternatively, at the contracting officer's discretion. The plaintiffs therefore have not demonstrated that they had a substantial chance of inclusion in the competitive range had the communications not occurred.

The plaintiffs—eliminated from the competition based on price alone—were not harmed by later communications regarding other offerors' past performance. Accordingly, they have not demonstrated prejudice stemming from the communications between the Air Force and other offerors.

**C. Professional Compensation Plans**

Abacus argues that the Air Force's evaluation of the eight offerors' professional compensation plans violated FAR 52.222-46, which was incorporated in the solicitation. (AR 790.) FAR 52.222-46(a) provides that a government agency must evaluate an offeror's professional compensation plan "to assure that it reflects a sound management approach and understanding of the contract requirements." An agency may rely on "data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure." *Id.* FAR 52.222-46(c) cautions against "[p]rofessional compensation that is unrealistically low or not in reasonable relationship to the various job categories." *Id.* Proposals with proposed compensation levels below those of incumbent contracts must be "evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees," and "may indicate lack of sound management judgment and lack of understanding of the requirement." *Id.*

Abacus argues that the Air Force failed to reasonably evaluate offerors' proposals according to FAR 52.222-46. (ECF 29 at 34-36.) Specifically, Abacus points out that the Air Force flagged some of the offerors' proposed labor rates as falling below the 10th percentile of salary data when compared to BLS data. The Air Force reached the same conclusion for all eight offerors that the proposed labor rates were realistic, without much qualitative analysis in the record. Abacus argues that this conclusion was arbitrary and capricious. Additionally, Abacus argues that FAR 52.222-46 required the Air Force to evaluate the proposed rates against incumbent contractor Valdez's salary data. Abacus argues that this evaluation was especially important given the fact that many offerors' proposals evinced an intent to recruit Valdez's employees on the incumbent contract.

In general, "minutiae of the procurement process . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 911 (Fed. Cir. 2013) (quoting this language).

In total, the Air Force highlighted 21 out of 331 proposed labor rates as falling below the 10th percentile according to BLS data. (Recording of oral argument on file with the court at 01:19:47-01:20:16, 01:58:22-01:01:58:50.) The ratio of 21 out of 331 corresponds to 6.34

percent. It is statistically rational that a small number, *i.e.*, fewer than 10 percent, of the labor rates proposed would fall under the 10th percentile of BLS data.

Additionally, the Air Force's comparison of the proposed labor rates against several benchmarks is instructive. For example, although approximately 20 percent of one offeror's labor rates fell below the 10th percentile of BLS data, those labor rates were above the 10th percentile based on data from Salary.com. (AR 18962-66.) It is not the role of the judiciary to second guess the minutiae of the Air Force's evaluation of a few potentially underpriced labor rates among hundreds submitted. The judicial role is to ensure the agency's overall procurement decision is not arbitrary and capricious.

Furthermore, Abacus's argument that the Air Force was required to compare the proposed professional compensation plans against compensation in the IAFNOS-1 procurement is unavailing. FAR 52.222-46(b) provides that when a professional compensation plan proposes salaries lower than those of an incumbent contract, the agency must determine whether the professional salary plan would "maintain[ ] program continuity, uninterrupted high-quality work, and availability of required competent professional service employees." In other words, when the proposed professional compensation plans are lower than those of the incumbent contract, an agency must undertake a price-realism analysis. *Cf.* FAR 15.404-1(a) ("The objective of proposal analysis is to ensure that the final agreed-to price is fair and reasonable.") The Air Force went above and beyond the bare requirements of FAR 52.222-46 by conducting a price-realism analysis of all eight proposals under consideration, whether or not the offerors' proposed salaries were lower than Valdez's salaries paid on the incumbent contract.

Moreover, the Air Force fully discharged the requirements for the evaluation of professional compensation plans in the solicitation. The solicitation explained that proposed professional compensation plans would be evaluated on the basis of "realism" based on "recognized national and regional compensation surveys and studies of profession, public and [ ] private organizations." (AR 790.) The Air Force compared proposed compensation to such surveys and studies. (*See, e.g.*, AR 18756-59.) FAR 15.404-1, which was incorporated into the solicitation, gives agencies discretion and flexibility as to how to analyze prices and costs. (*See id.*) FAR 15.404-1(b)(2) provides that an agency "may use various price analysis techniques and procedures to ensure a fair and reasonable price," and that examples of such techniques "include, but are not limited to" comparison with other proposed pricing and with prices obtained through market research. *See also DynCorp*, 10 F.4th at 1310 ("FAR 15.404-1 leaves the choice of price-analysis technique to a contracting officer's reasonable judgment in the context of an individual procurement.") Nothing in the solicitation or the FAR required the Air Force to compare proposed professional compensation plans with the incumbent pricing.

The Air Force reviewed the labor rates and comparative data and, based on that review, determined that the proposed rates were reasonable. The Air Force's conclusion is not arbitrary and capricious. The ample quantitative analysis performed by the Air Force using BLS data and data from Salary.com supports the conclusion, and further qualitative analysis and comparison to incumbent pricing were unnecessary. *See DynCorp*, 10 F.4th at 1313-15.

Even if Abacus's argument were meritorious, Abacus cannot demonstrate prejudice on the merits of this claim. Abacus's proposed TEP was significantly higher than those of the proposals technically evaluated by the Air Force. Even if the Air Force's evaluation of the professional compensation plans were arbitrary and capricious, nothing in the solicitation or the FAR would require the Air Force to evaluate Abacus's proposal. Even if the Air Force decided to exercise its discretion to evaluate additional proposals, the possibility that Abacus's proposal would be evaluated, let alone selected for award, is based on "conjecture" and "mere numerical possibility." *Bannum*, 404 F.3d at 1358. Abacus therefore cannot demonstrate prejudice on the merits.

Additionally, as the defendant argues, neither the solicitation nor the FAR prohibits the Air Force from analyzing the labor rates at multiple stages of the procurement. The solicitation specified that the Air Force would conduct price evaluations at Step 2 of the procurement. (AR 785.) The Air Force did so. (*See* AR 17753, 17782, 17819, 17856, 17899, 17948, 17984, 18023.) Because proposal revisions were likely, however, the Air Force took a belt-and-suspenders approach: In technical-evaluation memoranda, the Air Force committed to re-evaluating price reasonableness, balance, and completeness for a second time when proposals were revised. (*See, e.g.*, AR 17753-54 ("The AF intends to check all pricing for balance if the proposal is revised. . . . The AF intends to check all pricing for completeness if the proposal is revised.")) The Air Force rationally has determined that it will re-evaluate the labor rates if they are revised.

The Air Force complied with FAR 52.222-46 by comparing proposed labor rates to data from several sources and determining that the rates were reasonable and realistic. Abacus has failed to meet its burden of demonstrating that the Air Force's evaluation of the labor rates was arbitrary and capricious. The Air Force also complied with FAR 52.222-46 by noting in the record its intention to re-evaluate price realism and reasonableness if proposals were materially revised. Accordingly, the agency's findings should not be disturbed.

### D. The Release of Valdez's Information

Valdez argues that the Air Force's accidental release of its labor categories "constituted a potential violation" of the PIA, 41 U.S.C. § 2102 *et seq*. (ECF 30-1 at 15.) Valdez argues that the contracting officer's failure to report and document the possible PIA violation contravened FAR 3.104-7.

In response, the defendant argues that no PIA violation possibly occurred, so the Air Force did not need to follow the procedures under FAR 3.104-7.

Under the PIA, a government official "shall not knowingly disclose contractor bid or proposal information . . . before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 2102(a)(1). The statutory definition of "contractor bid or proposal information" includes "[i]nformation marked by the contractor as 'contractor bid or proposal information,'" submitted to a federal agency "as part of, or in connection with, a bid or proposal to enter into a Federal agency procurement contract, if that information previously has not been made available to the public or disclosed publicly." 41 U.S.C. § 2101(2)(D).

FAR 3.104-7(a)(1) imposes reporting requirements on contracting officers who become aware of a possible PIA violation, even if a contracting officer determines no violation has occurred:

> A contracting officer who receives or obtains information of a violation or possible violation of 41 U.S.C. 2102, 2103, or 2104 . . . must determine if the reported violation or possible violation has any impact on the pending award or selection of the contractor. . . . If the contracting officer concludes that there is no impact on the procurement, the contracting officer must forward the information concerning the violation or possible violation and documentation supporting a determination that there is no impact on the procurement to an individual designated in accordance with agency procedures.

A recent case from the Federal Circuit, *Mitchco International, Inc. v. United States*, is instructive. 26 F.4th 1373 (Fed. Cir. 2022). In that case, the protestor was the subcontractor on the incumbent contract. The protestor argued that the awardees of a contract had violated the PIA by improperly seeking or obtaining the protestor's cost or pricing data. *Id.* at 1382-83.

The Federal Circuit analyzed whether the awardees had violated the PIA, which prohibits "a person" from "knowingly obtain[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 2102(a)(1). Although a judge of this court had relied on the statutory definition of "person" to deny the plaintiff's claim, *Mitchco Int'l, Inc. v. United States*, 151 Fed. Cl. 537, 548-49 (2020), the Federal Circuit focused instead on whether the awardees had obtained "contractor bid or proposal information" under FAR 3.104-7. *Mitchco*, 26 F.4th at 1383.

The Federal Circuit noted that because one of the awardees was the prime contractor on the incumbent contract, the awardee was entitled to its subcontractor's cost or pricing data. *Id.* The supposedly proprietary cost or pricing data was thus covered by the PIA's safe-harbor provision. *Id.* (citing 41 U.S.C. § 2107(1), (2)).

Although the analysis could have ended with the holding that the safe-harbor provision foreclosed the protestor's claim, the Federal Circuit went a step further. The Federal Circuit quoted the GAO favorably for the proposition that "'the release of information regarding a prior incumbent contract does not meet the PIA's definition.'" *Id.* (quoting *In re S & K Aerospace, LLC*, B-411648, 2015 WL 7348967, at *4 (Comp. Gen. Sept. 18, 2015) (cleaned up)). The Federal Circuit classified prices on the current incumbent contracts or task orders as "'information that was generated during the performance of a contract or task order'" rather than "'contractor bid or proposal information.'" *Id.* (quoting *In re Eng'g Support Pers., Inc.*, B-410448, 2014 WL 7967482, at *3 (Comp. Gen. Dec. 24, 2014)).

The Federal Circuit concluded that the bid protestor had not established a PIA violation. *Id.* In a footnote, the Federal Circuit held: "Because [the plaintiff] failed to establish a PIA

violation, its claim that the contracting officer violated the FAR for failure to investigate the reported violations under FAR 3.104-7 also fails." *Id.* at 1383 n.6.

The plaintiff correctly pointed out at oral argument that *Mitchco* presents several key factual distinctions. For example, the bid protestor in that case claimed that another contractor—not the agency—violated the PIA. More notably, the safe-harbor provision of the PIA foreclosed the *Mitchco* bid protestor's claim because the prime contractor on the incumbent contract had the right to obtain cost and pricing data from its subcontractor.

Nonetheless, the Federal Circuit's interpretation of "contractor bid or proposal information" under 41 U.S.C. § 2102 applies to the present case. When Valdez submitted a spreadsheet with labor categories in the IAFNOS-1 procurement, that spreadsheet may have constituted "contractor bid or proposal information" under the PIA. Once, however, the Air Force accepted Valdez's proposal, the labor categories Valdez used to staff the contract became "'information that was generated during the performance of a contract or task order'" rather than "'contractor bid or proposal information.'" *Mitchco*, 26 F.4th at 1383 (quoting *In re Eng'g Support Pers., Inc.*, B-410448, 2014 WL 7967482, at *3 (Comp. Gen. Dec. 24, 2014)). The Federal Circuit's holding that information regarding an incumbent contract falls outside the PIA, *see id.*, is binding on this Court. Accordingly, the labor categories released by the Air Force therefore cannot constitute "contractor bid or proposal information" under the PIA.

*Mitchco* also illustrates that to prevail on a claim for a *possible* PIA violation under FAR 3.104-7, a bid protestor must demonstrate the *occurrence* of a PIA violation. *Id.* at 1383 n.6 (holding that the bid protestor's failure to demonstrate a PIA violation foreclosed its claim that the agency had a duty to investigate the supposed PIA violation). Because Valdez has not demonstrated the occurrence of a PIA violation, the Air Force had no statutory or regulatory duty to investigate the supposed violation. *See id.*

Even if *Mitchco* did not foreclose Valdez's claim, a contracting officer's duty to report and to investigate a supposed PIA violation depends on whether a PIA violation was "possible." FAR 3.104-7(a) (applying to a contracting officer who receives information of a violation or "possible violation" of 41 U.S.C. § 2102). In this case, no PIA violation was "possible" under 41 U.S.C. § 2102. The PIA prohibits the disclosure of contractor bid or proposal information only during a certain time period: "before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 2101(a)(1). Valdez's labor categories related only to the IAFNOS-1 procurement; Valdez has not argued that it used exactly the same labor categories in its proposal for the IAFNOS-2 contract. The PIA therefore does not apply to Valdez's proposal for the IAFNOS-1 procurement.

Additionally, the labor categories disclosed in the draft PWS are so generic that it strains credulity that they might be proprietary. Unlike in Valdez's proposal for the IAFNOS-1 procurement, which was marked proprietary, the labor categories published in the draft PWS were bereft of any descriptions or associated cost and salary data. It is highly unlikely that any other offeror in the IAFNOS-2 procurement gained a competitive advantage by learning that the incumbent network support services contract included categories of personnel like Project

Managers and Network Engineers. Indeed, the record reflects that each offeror took a unique approach to its proposed staffing for the IAFNOS-2 contract.

The Air Force contracting officer thus correctly assumed that there had been no "possible" PIA violation under FAR 3.104-7. Valdez's argument that the contracting officer must have investigated or reported the disclosure therefore fails. Accordingly, the Air Force's disclosure of Valdez's labor categories in the draft PWS violated neither 41 U.S.C. § 2102 nor FAR 3.104-7.

**E. Pre-Award Debriefing**

Valdez argues that it is entitled to a more complete pre-award debriefing and to an opportunity to receive answers to questions regarding the source-selection procedures and other procurement-related information. (ECF 30-1 at 18-19.) Valdez argues that the debriefing process has violated FAR 15.505(e).[11]

The defendant argues that the debriefing process complied with procurement law and that Valdez could have asked follow-up questions, as other offerors did. (ECF 31 at 42-43.)

Under FAR 15.505(e), pre-award briefings must include:

> (1) The agency's evaluation of significant elements in the offeror's proposal;
>
> (2) A summary of the rationale for eliminating the offeror from the competition; and
>
> (3) Reasonable responses to relevant questions about whether source selection procedures contained in the solicitation, applicable regulations, and other applicable authorities were followed in the process of eliminating the offeror from the competition.

---

[11] Valdez also argues that the pre-award debriefing violated 10 U.S.C. § 2305(b)(6)(A). Section 2305 of Title 10 was repealed effective January 1, 2022. William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4293 (2021). Subsection 2305(b) was transferred to several other statutory provisions, including 10 U.S.C. § 3305, titled "Pre-award debriefings." *Id.* at 4182. That provision is now analytically identical to the relevant portions of FAR 15.505(e). *See* 10 U.S.C. § 3305(d) (providing that a debriefing must include the same three elements listed in FAR 15.505(e)).

Valdez requested its pre-award debriefing on February 24, 2022. (AR 18243.) At that time, only § 3305(d)—not § 2305(b)(6)(A)—of Title 10 applied to pre-award briefings. This opinion therefore focuses on whether the debriefing complied with the requirements of FAR 15.505(e).

Valdez was eliminated from the competition because of its proposed price alone. The debriefing letter explains that because Valdez's TEP was not among the eight lowest TEPs, "no further evaluation was conducted on [Valdez's] proposal." (AR 18240.) In other words, no other "significant elements" of Valdez's proposal were evaluated. *See* FAR 15.505(e)(1). The debriefing letter complies with FAR 15.505(e)(1) because the TEP was the only significant element of Valdez's proposal that was evaluated by the Air Force.

Additionally, Valdez received a "summary of the rationale for eliminating" Valdez from the competition, as required by FAR 15.505(e)(2). The debriefing letter explains that only "the **eight** lowest priced proposals" were evaluated, and Valdez's proposal "was not among the eight lowest priced proposals." (AR 18240 (bold in original).)

Valdez's claim thus hinges on whether the Air Force's debriefing complied with FAR 15.505(e)(3). Although Valdez asserts that it was entitled to "reasonable responses to relevant questions" about the IAFNOS-2 procurement before the close of the debriefing period, Valdez does not articulate what those questions were. FAR 15.503(e)(3). Valdez also does not explain why it did not raise its questions to the Air Force upon receipt of the pre-award debriefing. Instead, Valdez asserts that it had assumed that it could not ask the contracting officer any questions because the debriefing letter had provided that "debriefing of IAFNOS-2 is considered concluded upon the receipt of this letter." (AR 18240.) Valdez argues: "A debrief is not Schrodinger's cat. It is either open or closed and here the Air Force declared that the debrief was closed." (ECF 36 at 18.) Once the debriefing period had closed, Valdez had only five days to file a bid protest. (*Id.*)

The Air Force complied with FAR 15.505(e)(3). Valdez never posed any "relevant questions" to the contracting officer in connection with a pre-award debriefing. FAR 15.505(e)(3). It was therefore impossible for the debriefing to include responses to questions that were never asked. The contracting officer should not be placed in the position of a mind-reader; she had no reason to know that Valdez had any lingering questions after receiving the pre-award debriefing letter. The requirements of FAR 15.505(e)(3) were thus met.

Even if Valdez could mount a valid argument on the pre-award debriefing, however, it would avail Valdez nothing. Valdez has not explained, and the Court cannot discern, how Valdez was prejudiced by the supposedly defective pre-award debriefing. Valdez is unable to demonstrate prejudice on the merits of this claim.

The Air Force's pre-award debriefing complied with FAR 15.505(e), and even if it did not, Valdez can show no prejudice from a lack of compliance with that provision.

## VI. CONCLUSION

Abacus and Valdez have failed to establish standing on all their claims. Although Valdez has standing to protest its elimination from the competition and the release of its data, Valdez has not alleged facts sufficient to establish that it had a substantial chance of award absent the allegedly unlawful communications or the allegedly defective pre-award debriefing. Additionally, Abacus has not alleged facts demonstrating that it had a substantial chance of

award absent any of the alleged errors. Accordingly, two of Valdez's claims and Abacus's complaint are dismissed pursuant to RCFC 12(b)(1).

Moreover, in the IAFNOS-2 procurement, the Air Force has complied with the express terms of the solicitation and with relevant procurement laws and regulations. The elimination of the plaintiffs from the competition was not arbitrary and capricious, and the plaintiffs were not prejudiced by later communications with other offerors. The Air Force appropriately evaluated other offerors' professional compensation plans, did not violate the PIA, and provided all the information it was required to in its challenged pre-award debriefing. Accordingly, the plaintiffs' motions for judgment on the administrative record are denied, and the defendant's motion for judgment on the administrative record is granted.

The Court will enter an order in accordance with this memorandum opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**